W. LEE WEADON

*vs.*

ESTATE OF ALEXANDER McNAB

FIRST NATIONAL BANK AND TRUST CO., AL ᵛ⁻..

Superior .Court   ·   Fairfield County     File No. 04058

MEMORANDUM FILED APRIL 6, 1942.

*Kiernan & Noonan*, of Bridgeport, for the Plaintiff.

*David Goldstein*, of Bridgeport, for the Defendants.

FOSTER, J.  W. Lee Weadon is a physician and surgeon practicing his profession in Bridgeport. Alexander McNab is deceased, and his estate is in process of settlement as an insolvent estate by the Probate Court for the Probate District of Fairfield. Doctor Weadon presented to the administrator *c.t.a.* of the estate of Alexander McNab, deceased, a claim amounting to $1,265. This claim was disallowed by such administrator *c.t.a.* Commissioners were duly appointed by such probate court to receive and pass upon claims against such estate and passed upon the claim of Doctor Weadon. The commissioners rejected in part the claim of Doctor Weadon and so reported to the Probate Court for the District of Fairfield, and such court accepted such report. Doctor Weadon, being aggrieved by the action of the commissioners in disallowing a part of his claim, has duly appealed to this court.

In passing upon this claim this court must be guided solely by the evidence, a transcript of which has been carefully perused by the court, and the one exhibit in the case, an original book account.

Certain facts, while denied in the pleadings, are not disputed upon the trial

For many years Doctor Weadon has practiced the profession of a surgeon in the City of Bridgeport. Doctor Weadon performed professional services to Mr. McNab, and Mr. McNab's first wife, Violet McNab, and to Mr. McNab's second wife, Sally McNab, from July 26, 1933 to October 30, 1939. These services appear upon the card Exhibit A which is as follows:

"McNab, Mr. Alex.        212 Brookbend Rd., Ffld.
    1933                                50 Brooklawn Ave.
July 26-Aug. 10 Violet McNab
        Radical Amp. of breast                1,000.
    1934
June . .-Aug. 27
        30 house calls at $5 each              150.
    1937
July 4 Mr. McNab—Osteo. of left foot      25.
    1938
Aug. 3 Sally McNab
        Paracentesis of abdomen                 50.
        7 Hospital Visits                       35.
    1939
Oct. 30 Physical—Referred to
        Dr. Nickum                               5.
                 Total         $1,265."

The entries on this card were made by the witness Frances Bowen, secretary to Doctor Weadon, and were made each at or about the time the services were rendered.

That the cost of these services to himself and to both of his wives was a debt of Alexander McNab is not disputed.

Mr. Nicholson, a witness for the estate, testified in part as follows:

"Q—Will you tell the court what Alexander McNab said to you relative to any services rendered by Doctor Weadon to him and to members of his family?

"A—I might preface this by saying that for many years I was socially intimate with Mr. McNab as well as representing Mr. McNab and representing the McNab Corporation after its formation. In that way I was in Mr. McNab's office, oh, every two or three days, sometimes on business matters, sometimes just social calls. We knew Mrs. McNab—myself and

my wife knew Mrs. McNab very well. We knew of her first operation—

"THE COURT: Which Mrs. McNab?

"THE WITNESS: The first Mrs. McNab.

"Q—You mean Violet McNab?

"A—Yes, we knew of her first operation and that Doctor Weadon performed it. We were very close to Mrs. McNab during the year following it so long as she lived. After her death Mr. McNab spoke to me about Doctor Weadon's bill and this is not once but many times, saying that he had tried to get a bill out of Doctor Weadon and he had never been able to do so. Finally at one time he told me that he had got ashamed of himself because he considered that he owed Doctor Weadon and he had not been able to get a bill and consequently he had given him the grand piano, the liquor cabinet and a leopard coat to Doctor Weadon to Mr. McNab's satisfaction that the bill was then paid."

This fact is also confirmed by Mr. Ricker, a witness for the estate, who testified in part as follows:

"Q—Did you talk to Alexander McNab about the services rendered by Doctor Weadon after he rendered such services to Mrs. Violet McNab?

"A—Mr. McNab spoke to me about it and just told me that he has not been able to get any bills from Doctor Weadon.

"Q—And what did he tell you he did when he could not get the bills?

"A—He said he asked Doctor Weadon several times to send him a bill,. and Doctor Weadon said 'That is all right, Alex, you will get it some day.'

"Q—Do you remember what he said about the piano—giving him the piano?

"A—Yes. After the death of Mrs. McNab, the first, Alexander McNab came to my house and very much overjoyed said that he has settled the account with Doctor Weadon by giving Doctor Weadon a piano and to Mrs. Weadon a fur coat and I believe another piece of furniture which I did not see."

That the amount of the charges is reasonable is not dis-

puted. The largest item, $1,000, was for a radical amputation of the breast of Mrs. Violet McNab, which Doctor Weadon testifies was a major operation, which fact is not disputed.

So we have the plaintiff's case that a surgeon performed necessary professional services for the decedent and his two wives for which the decedent expected to pay a reasonable sum, and the sum charged is reasonable.

I discuss the three special defenses in reverse order as they appear in the answer.

As a third special defense the defendant says that the services were rendered gratuitously and without expectation of remuneration or reward.

Doctor Weadon caused his secretary to make a book account of the charges, Exhibit A, in the day and time of the rendering of the services.

Doctor Weadon never presented to Mr. McNab any bill for his services. Why did he not present a bill? Upon the witness stand Doctor Weadon answers this question as follows:

"Q—Did you ever bill during his life Alexander McNab for those services?

"A—No, sir.

"Q—Why not?

"MR. GOLDSTEIN: That is objected to. He did not bill him.

"MR. KIERNAN: I claim it, your Honor.

"THE COURT: I will admit it.

"MR. GOLDSTEIN: Exception.

(Last question repeated by the stenographer.)

"THE WITNESS: That is a long story.

"MR. GOLDSTEIN: Pardon me. May I make this claim for the record? Your Honor has already ruled, but I would like to have this statement on the record. Of course you will notice that we have pleaded the statute of limitations as a defense and any reason that he now gives or any mental operation as to the reason that he did not bill Mr. McNab is

immaterial and irrelevant. I claim that he did not bill him, and any reason does not help him in avoiding the statute of limitations.

"THE COURT: I do not consider it on the matter of the statute of limitations. I consider it on the ground that the plaintiff claims to have rendered services to the wife of Alexander McNab in July, 1933, and he is making claim against the estate of Alexander McNab, deceased. Now he is asked a question if he ever rendered a bill to Alexander McNab and he answers 'no.' Now there is a fair inference which might be made by the defendant that failure to render a bill to Alexander McNab in his lifetime was an admission on the part of the plaintiff that no bill was owed, and so I think it is fair that the plaintiff be permitted to repudiate that inference. You may proceed.

"THE WITNESS: In the first place I happened to know the financial situation of Mr. and Mrs. McNab at the time that these services were rendered. They were both close personal friends of both myself and Mrs. Weadon, and Allie was in, and later on a good many times, financial difficulties with his little companies, which cost me additional money in buying some of his stock, first in the McNab Company, which petered out in a little while. This is before Violet's operation. Later on, in the Absorbobilt Company for money advanced to him for his stock, which I appreciated was probably not worth anything, but I knew his situation perfectly. He was at my house quite often, and during that time I realized it was perfectly useless to send him a bill and I thought too much of him and his wife to embarrass him by sending him a bill. Later on, when he began to improve in his financial status, he told me on more than one occasion that after certain things would happen, certain changes in his business, that he was going to surprise me and come in the office and bring me a thousand dollars to apply on his account. That he told me on several occasions. The last time he told me that was probably two or three years before he died, not very long before 1939, when I made this physical examination of him. I don't recall dates. I just can't remember the dates. When I examined him that time, I appreciated that he was not going to live very long, and I told my secretary not to send him a bill. I did not want to add to his troubles. That is where it was poor business. I am a sucker, and will prob-

ably live and die a sucker. I do it all the time. That is the reason for no bill."

I am of the opinion that from the evidence it is clear Doctor Weadon made a charge against Mr. McNab and expected to be paid for his services, and Mr. McNab expected to pay for the services.

The second special defense is that Doctor Weadon accepted from Mr. McNab a grand piano, a leopard coat and a liquor cabinet.

Doctor Weadon testifies in part as follows:

"Q—Will you tell the court about that transaction, Doctor?

"A—Yes. Years before Mrs. Violet McNab became ill, she acquired this player grand piano, and I don't think she had had it three months, as far as my recollection goes— certainly she hadn't had it a long time before she made the statement, when Mrs. Weadon and I were at their house one night, 'Mabel' (that is Mrs. Weadon) 'when I die, you are to have this piano', and she reiterated that statement, I ven- ture to say, a hundred times between that time and the time of her death.

"Q—The piano was Mrs. McNab's?

"A—As far as I know it was. I don't know whose it was. I never saw the bill of sale.

"Q—It was given to whom?

"MR. GOLDSTEIN: First of all I would like to find out before that question is answered whether he was present when this took place.

"THE COURT: He says he was.

"THE WITNESS: Not the hundred times. I heard the statement made innumerable times.

"Q—The piano was given to whom, Doctor?

"A—To Mrs. Weadon.

"Q—Were any of those promises by Mrs. McNab about the piano to Mrs. Weadon made prior to the date of Mrs. Violet McNab's surgery?

"A—Oh, yes, oh, yes.

"Q—And the piano was given to Mrs. Weadon when, in relation to Mrs. McNab's death?

"A—You mean when was it delivered to her after her death?

"Q—Yes.

"A—I couldn't tell you that; probably about a year later.

"Q—By whom?

"A—By Mr. McNab.

"Q—Whether or not you had any conversations with Mr. McNab about the piano after Mrs. McNab's death.

"A—No, no definite conversations; no, except he would still come to our house quite frequently and would discuss the fact that 'I may send—I must get to it and bring you that piano', speaking to Mrs. Weadon, and we told him 'That is all right; forget it.' We did not expect the piano, and we did not want the piano,—I certainly didn't. But he finally brought it and took our old piano back to his house.

"Q—What was that last?

"A—He took our old piano that we had had. He said 'Now I have got a blank space in my living room. I will take your old piano back to fill up the additional space.'

"Q—So he took your piano?

"A—Yes. We had an upright piano.

"Q—Another item that was mentioned was a leopard coat. Was a leopard coat ever given to you?

"A—Not to me, no.

"Q—To whom?

"A—To Mrs. Weadon.

"Q—By whom?

"A—Alexander McNab.

"Q—Was that a coat suitable for a man or a woman?

"A—It was a woman's coat.

"Q—What do you know about that?

"A—Not a thing except he gave it to her and it was a leopard coat. I don't know—as far as I know, she has never had it on.

"Q—And the liquor cabinet which is alleged.

"A—That was a very beautiful liquor cabinet, which Mrs. McNab brought back from Europe and she gave it to us— she and Allie together gave it to us for Christmas, as a Christmas present.

"Q—That was the Christmas present from Mr. and Mrs. McNab to you and Mrs. Weadon?

"A—Yes.

"Q—The origin of the cabinet was what?

"A—It came from England.

"Q—Brought by whom?

"A—By the two of them; I understood, at least, that it was.

"Q—Did you take those items as payment or partial payment of your account?

"A—Why, certainly not.

"Q—Did you ever have any conversation with Mr. McNab to that effect?

"A—No, sir.

"Q—Did he ever tell you that he was giving them to you as payment of his bill?

"A—No, sir; furthest thing from his mind."

Doctor Weadon is in part corroborated by the testimony of Victoria Ellen Bishop, a sister of 'Mrs. Violet McNab.

It is to be noted as an undisputed fact that Mr. McNab and his wife Violet and Doctor Weadon and his wife were close social friends and visited the homes of each other.

So we have the admission of Doctor Weadon that he never sent Mr. McNab a bill and Doctor Weadon's explanation as to why he sent no bill; we have the statements of Mr. Nicholson and Mr. Ricker. It appears that Mr. McNab, being unable to secure a bill from Doctor Weadon, was pleased that he had made presents of value to Doctor Weadon

and his wife and said so to his friends, Mr. Nicholson and Mr. Ricker. But there is not a scintilla of evidence in the case that Mr. McNab did in fact turn these articles over to Doctor Weadon in payment for his professional services or that Doctor Weadon so accepted them.

And now we come to the first special defense, which is that the claim as a whole is barred by the statute of limitations. The statute is as follows: "No action for an account, or for a debt due by book to balance book accounts, or on any simple or implied contract, or upon any contract in writing not under seal, except promissory notes not negotiable, shall be brought but within six years next after the right of action shall accrue...." (Gen. Stat. [1930] §6005.)

The defendant claims that the first two items appearing on Exhibit A were for services performed more than six years prior to the presentation of the claim against the estate. The plaintiff claims that his claim is based upon an open running account commencing in July, 1933, and extending down to the date of the last item in 1939.

Counsel for the plaintiff and the defendant have presented in brief numerous citations on this question. Nothing is to be gained by an analysis or comparison by the court of these many cases. A fair statement of the law is that: "It is clear enough that an open account must be one that is not closed. A 'continuous open current' account, having reference to the well understood meaning of the words embraced in this phrase, is one that has no break or interruption, and constitutes a connected series of transactions." 1 R.C.L. Accounts and Accounting §2.

The best and most conclusive evidence on this question is Exhibit A itself. It is an original document, the items being entered by the bookkeeper, the witness Frances Bowen, by direction of the plaintiff at or about the time the services were rendered. There is no end to the account until after the last item, when the account is totalled. All of the evidence tends to show that the services of the plaintiff were continuous—that is, when the decedent needed the services of a surgeon for himself or his wives, he called upon the plaintiff to render such services. Evidence brought out by the defendant that the plaintiff never presented a bill to the decedent tends to show that the account was a continuous run-

ning account. Evidence produced by the defendant that the decedent had endeavored to secure from the plaintiff a bill tends to show the same thing. So also the second defense of the defendant and evidence in support thereof, statements by the decedent that he had made to the plaintiff presents of an uncertain value and so settled his account with the plaintiff, show an open undetermined account. I do not consider any statements of the defendant's decedent as taking the case out of the statute of limitations. I do consider such proved statements of the defendant's decedent as tending to show the character of the account.

I find that the claim of the plaintiff is based upon the open running account; that on October 30, 1939, the defendant's decedent owed the plaintiff $1,265; that interest on that sum from October 30, 1939, to this date at the rate of six per cent per annum is $184.90.

The appeal is sustained, and judgment is rendered that the claim of W. Lee Weadon against the estate of Alexander McNab, deceased, be allowed in the sum of $1,449.90.